Thank you Judge McKeon. Good morning your honors. May it please the court and counsel. My name is Tim Gabrielson. I'm from the Federal Public Defender's Office in Tucson and I represent Ernesto Martinez in this capital habeas corpus appeal. I thought going in I would spend my time talking solely about the two implied bias claims, which are claims one and two in the opening brief. And then the CVAC v. Hardis and the Brady and Dupuis claim in claim four of the brief. But a couple of weeks ago this court, another panel of this court, announced a decision in Sprites v. Ryan, a causal nexus claim out of the state of Arizona. And I thought I would at least comment briefly on, I think, what the implications of Sprites are for Mr. Martinez's case. Judge McKeon Let me speak for myself only. There are a lot of issues and of course you only have 30 minutes, but I am particularly interested in the Eddings Sprites issue. Tim Gabrielson Okay, very well. And I did file, I mean the decision only came down a couple of weeks ago. And unlike some of my colleagues, maybe it was too close to the oral argument for this panel to order letter briefs on Sprites, but I did include it in the 28-J letter along with Judge Fletcher and his panel's opinion in the Echavarria case from Nevada, the Nevada death penalty case that turns on the question of implied judicial bias. So I am prepared to discuss both of those that appeared in the 28-J. The decision in Sprites, I think, confirms what we argue at page 81 of the opening brief in Martinez, and that is where the Arizona Supreme Court says that a family history, though regrettable, is not entitled to wait as a non-statutory mitigating factor. That is consistent with what another panel of this Court found in Sprites. It is consistent with McKinney. And I think Mr. Martinez and Mr. Sprites, when I represented Mr. Sprites before a panel of this Court, and when that panel ordered the briefing on the McKinney decision, my briefing indicated that Mr. Sprites' causal nexus claim stood fine by itself, even apart from the now controversial part of, I think, the McKinney ruling where the en banc court said that there had been a 15-year period in which the Arizona Supreme Court had improperly to these Arizona death penalty cases. And I completely agree with that part of the McKinney opinion, but there are a number of our clients who I think their causal nexus claims stand just fine without reference to the McKinney history that has come under some scrutiny. So in this particular case, I think that Mr. Martinez' dysfunctional history was as bad as the cases that come before the Court in some of the worst of cases. Mr. Martinez, as a 9- or 10-year-old, was beaten severely by his father, leaving with a belt and other instruments, leaving welts all over his body. And his sister, Julie, an older sister who is now retired from the Air Force, but who was a sentencing hearing witness for Mr. Martinez, talked about the history of growing up in that family home. And it wasn't pleasant, she testified, that she and her brother, as preteens, slept with weapons in their beds, including knives and hammers, because their father would come home drunk and try to beat their mother to death. May I ask you, with respect to the aggravating circumstance of a peace officer, I don't see a lot of precedent in Arizona written about, you know, how that weighs in. I mean, it says what it says, as an aggravating circumstance. But I'd appreciate if you could, if you have any elaboration on it, other than as just a stand-alone aggravating factor. I think it, Judge McKeon, obviously it is a stand-alone statutory aggravator, but I think what happens, what happened in Mr. Martinez' case, the, it's prejudicial enough, I think, when the victim of a homicide is a peace officer. And there are some that suggest there's no quantum of mitigation that could ever outweigh the fact that one of our clients or a criminal defendant took the life of a peace officer. But, of course, the Eighth Amendment doesn't allow for that kind of gradation of aggravation. In other words, that particular statutory aggravator is not entitled to any more weight than heinous or depraved or multiple victims. My question is, is it then baked in as an aggravating factor and it doesn't get embellished simply because it's a police officer? Well, here's, I think, where the embellishment came in this case. And that is, there was a show of force in the courtroom during Mr. Martinez' trial. There were between 30 and 50 uniformed police officers. Defense counsel moved to have the officers not show up in their uniforms if they were going to come to attend the proceeding. There was a uniformed officer who escorted the victim's widow to her chair in the courtroom every day that the trial took place. So in terms of what additional embellishment can attach when the victim is a peace officer, I think the dynamic in the courtroom, I think the public opprobrium for that type of offense, even though in this particular case Mr. Martinez was a teenager when this happened. And we there's some evidence of it in this case, but it's not a huge factor for us. But the human brain doesn't fully develop until approximately age 25 in terms of being able to check impulses and things like that. So I think it was an unfortunate conflation of events in this case where the victim was a peace officer, there was a presence in the courtroom, there was a show of force in the courtroom to be sure that the defense counsel did ask the judge to sort of curb the effect of in the courtroom. So, yeah, it's a standalone statutory aggravating factor, but it's probably unique among the aggravators in Arizona. We have a number of cases where the peace officer was the victim of the crime, much as in the Echavarria case, the FBI agent was the victim of the crime. And again, I'm... But Echavarria, that was not a sentencing question. It was not an aggravator question. It was a bias question. Correct. And I understand that, Your Honor. But I think that I'm just using that to sort of illustrate what the dynamic is in terms of how the public reacts to those sorts of offenses and the outpouring of support from the law enforcement community. As we try to evaluate prejudice on the Eddings claim, on the causal nexus claim, are we trying to predict what a sentencing judge in Arizona would do with this? Or is it more abstracted from this? That is to say, if I'm trying to predict what a sentencing judge in Arizona would do with this, rather than sort of saying, well, this is an aggravator, and I don't get to consider that the aggravator is killing a police officer, I get different answers. So what am I supposed to do? Am I supposed to predict what an Arizona sentencing judge would do in this case if family history were counted and Eddings were not violated? Well, it's not so much, Your Honor, I think what a single sentencing judge would do, because these cases are going to come back to this Court, because when these cases have gone back to the Arizona courts for either resentencing or correction of the error, the Arizona Supreme Court has decided the guy doesn't get resentencing. Today he would get a jury trial after Ring v. Arizona. No, I understand. He doesn't get that. So all these cases are getting today over fierce objection from us, and these cases are going to come back in habeas to Your Honors. But is the guy entitled to something more? In fact, we're making arguments in the Arizona Supreme Court right now that the Eighth Amendment requires that a fact finder hear the evidence, because at the trial court level, those views are skewed by the 15-year history of that McKinney outlined of the Arizona Supreme Court even restricting what the State Superior Courts in Arizona can do with the evidence. But all's we're getting right now is a new independent reweighing of aggravation and mitigation, which In the Supreme Court? Yes, in the Arizona Supreme Court, which I think I counted this may be case number 10 here. Have any of those gone all the way through the Supreme Court? The prior ones where there was a remand? I think the Stiers case has come back to this Court, but I think they've gone up to the Supreme Court on cert from the re-sentence of death in the State Supreme Court. I don't think any of the cases that have come back through this Court, including Stiers, have gone to the U.S. Supreme Court yet on certiorari. But we've held in Stiers that the judge re-sentencing is all right. I have to say I think that's wrong, but that's the holding of our Court. Yes, and I understand that, Your Honor. And I think, you know, and I recall Your Honor wrote the plurality in Dietrich, right, that said the case ought to go back for consideration. Some of your colleagues thought that the Dietrich ineffective assistance of counsel claims could be decided on a paper record, and Your Honor wrote a plurality opinion saying we're an appellate court. Well, that's what's a plurality there. Yes, it is, and I understand that. But the question I asked, you didn't, you almost answered it, but not quite. As I'm trying to decide prejudice in this case, what is the question I ask myself? Do I ask what a sentencing judge in Arizona would have done if family history had not had the Eddings error, or do I ask in a more abstracted sense? Because if I'm asking what a district, what an Arizona sentencing judge would have done with the killing of a peace officer as an aggravator, that, I think I'd get a different answer than if I'm just saying, well, talking about the aggravator in the abstract. But you should and should you, Your Honor. I mean, in the abstract, it should really be the same, but you're asking as a practical matter. Does that make a difference? Yes, I think it makes a difference, but I don't think that the Eighth Amendment allows us or allows this Court to come to the conclusion that somehow the quantum of that mitigation that wasn't considered has to be somehow higher in the killing of a peace officer than it would be for the killing of some other citizen. But we do like evidence, don't we? Let's assume for a minute that the nexus issue that plagued the California, I mean, Arizona Supreme Court for so many years. Say we find that's an unconstitutional issue in this case. Then we're outside of AEDPA, but we still have to find there's prejudice. My colleagues have suggested this is what we're wrestling with. What's your best argument? Factoring in the fact it was a police officer, the fact there was a second murder, et cetera. How are we supposed to measure prejudice in this case? Well, the evidence that wasn't considered because of the causal nexus requirement was also evidence that should have supported the psychologist testimony who found that Ernesto Martinez suffered from post-traumatic stress disorder. I don't know how you disentangle our Claim 7 from our Claim 8 in the brief because a psychologist testified. The judge found her testimony not to be compelling in part because some of the history of Mr. Martinez was found not to be reliable or credible. But I think, again, that was viewed through the prism of causal nexus. But with respect, counsel, at least it seems to me that what the US Supreme Court tells us is it's okay to weigh these things. You can't ignore them, but you can weigh them. So if the Arizona Supreme Court was weighing this or the sentencing court was weighing the evidence and they didn't give as much credence to the psychologist or to PTSD or whatever the case might have been, isn't that okay in terms of analyzing prejudice? I'm not sure it is okay, Your Honor, for this reason. I think the problem is the most significant evidence upon which the psychologist's opinion in Mr. Martinez's case rested was on the evidence that was discredited based on causal nexus. The evidence that Mr. Martinez suffered from anxiety disorders as a teenager when he was in juvenile institution, that was given no weight by the court. But again, it was considered, it just wasn't given weight. And I guess my question to you would be, is weighing versus not considering different in this case? I think what's clear, I think we have to take the words of the Arizona Supreme Court when it said it's not entitled to any mitigating weight because of no causal nexus. That means the court washed its hands of that evidence and didn't consider it. And I know that's the crux of the issue in many of these cases going forward when a court says, I considered it, I gave it no mitigating weight. What's this court supposed to do with that? I want to go back, though, to merge these two questions. And that goes back to do we look at what a sentencing judge would do or even this sentencing judge as opposed to the Arizona Supreme Court? It seems to me the Arizona Supreme Court was more of a sentencing court. You get closer, I think, to what Judge Smith is talking about. And that is considering but not giving it weight or giving it little weight. Does that in some ways answer the question for us? It would answer the question if the sentencing court in Arizona were the superior court where the point you're making is a good one, Judge McKeown. And that would be true if that were the final sentencer in the state of Arizona. But as the court is clear, it's de novo review by the Arizona Supreme Court, an appellate court sitting as a fact-finding court and weighing, aggravating, and mitigating circumstances. I understand that we're looking at what the Arizona Supreme Court did. But it does go back to Judge Fletcher's question. Am I looking at an abstract weighing of evidence where, in fact, I have what an Arizona judge not only might do but did do? Or do we just wipe off the table what happened in the sentencing court here? Well, I can tell you that there's a case not cited by the parties. And I'll file a 28-J on this. But there's a case that lost in the Ninth Circuit that later won in state post-conviction, a fellow named Kevin Miles. And that case went back for additional on a successive post-conviction petition where new mitigation was the introduced. And there was a discussion in the Arizona Supreme Court about what the proper standard is. Is it an objective judge looking at all the new evidence in mitigation or is it the judge now deceased from 25 or 30 years ago and what his proclivities were and how he would have responded to the evidence? And that question came out that it's because the judges are no longer around, the case can't be sent back to him for his judgment about that. It necessarily has to be the objective standard of what a reasonable judge would do in terms of handling the new evidence. So in our case, if we say that Edput doesn't apply because of what happened in the Arizona Supreme Court and we look at all of the facts in this case as set forth in the record, we, I assume, are then to weigh ourselves and determine and taking into account everything that's in the record, whether your client was prejudiced. Is that correct? Yes. Okay. And in doing so, are we limited by what came out at the trial? Can we take into account the arguments that were made in the Arizona Supreme Court? Are we limited in any way in what we consider in making our prejudice analysis? You're not limited in any way by anything that occurred in the Arizona state courts during the sentencing of this matter and what the Arizona Supreme Court may have reached out to consider that was in the record but wasn't emphasized in front of the trial court. Thank you. Okay. I'd like to move on to the implied judicial bias claim. The courts are always so well prepared. I don't think I need to go much into what the relationship was of the trial judge in this case to his bailiff, which was described by the presiding judge in Maricopa County as a family relationship and that's why the presiding judge recused the judge for the sentencing hearing. We submit, and I think this is absolutely true, Judge Hotham was under the impression that at the point when he presided over the guilt phase of the trial that he was going to be around to do the capital sentencing when this thing was over. And so I don't understand how one could say that because he was only found to suffer from an implied bias at sentencing that that didn't extend to the guilt phase of the trial because he was. How do you know that he thought that, that he was going to be around? Is there something he said in the record? Well, he denied the request to remove the bailiff. He didn't recuse himself. He violated the code of judicial conduct by not bringing it to counsel's attention that he had a relationship. With respect, I know that. What I'm talking about is you said a minute ago that he assumed he was going to be there for the sentencing. And I'm asking, did he say that that was the case? I know what he did or didn't do with the bailiff and so on and so on. He was, in fact, removed in the guilt phase, but he was put back later on or became the sentencing judge. But did he know that was going to be the case? I think the only inference to draw, Your Honor, is that of course he knew that was true and he clung to this case. He wanted this case. There's this whole mysterious nunk-pro-tunk order, right, after the case goes back for state post conviction and the case is assigned initially to a Judge Michael Wilkinson, a former public defender in Maricopa County. Eight days later, there's a nunk-pro-tunk order issued by Judge Thomas O'Toole, the presiding judge in the criminal division, saying that that order is rescinded and he's reappointing Judge Hotham to take the case. That certainly drew our attention. I sent letters to the judges asking to interview them. And Judge Hotham probably wisely refused my request to be interviewed. But Judge O'Toole called me at 5 o'clock on a Friday afternoon when I had no prover available in my office to sit in on the interview. As you know, as former lawyers yourselves, the last thing a lawyer wants to do is be a fact witness to something going on in court. So Judge O'Toole calls me at 5 o'clock and he tells me, and it's reduced to my declaration in this record, what he told me, that he was unaware that Judge Hotham had been removed for cause. And what was strange, Your Honors, is he then filed an order in both state court and the U.S. District Court memorializing his view of the conversation that he and I had. There was no state court action pending. And as far as I could tell, there's no, there's nothing that gives a state court judge any standing to file something in the U.S. District Court because he wants his view about something considered by the district court as a capital habeas corpus case is moving forward. So when he did that, I filed, I sent him a request to further clarify what he and I talked about because I thought it was incomplete. And he then filed something called a ruling saying that my request to have further comments about our discussion memorialized somehow was denied. So he reacted by filing three things in court that he was not a party to, he was not a party to any of these actions. And I think that, again, that drew our curiosity because, I mean, most of us have been practicing law for 30, 35 years. I've never had anything like that happen where a judge reacts to some kind of inquiry about something by filing something in two courts wanting to have his view so, so. But this was the presiding judge to which you refer, right? This was the presiding judge in the superior court, not the judge on this case. Right. I thought your beef was with the sentencing judge, not the presiding judge. No, Your Honor. I'm sorry if I misspoke or left you with a false impression. So this is, so it was not only that he'd been removed for cause from sentencing and we cite the cases in our brief that says once a judge is removed in a cause in Arizona, he's out for good. I can't even fathom, I've been in front of federal judges for more than 31 years. I cannot fathom being in front of one of Your Honors who, for some reason, recuses him or herself or is, I know in our system, Your Honors have to individually decide if you're going to take yourself off a case. I can't imagine one of Your Honors being recused in a case or recusing yourself and then somehow inserting yourself later and saying, whatever the conflict was has been cleaned up and now I can go back to sitting in judgment as the case then moves forward. This is the same case. It's the same case number. It's the same parties to the case. And yet in this particular case, Judge Hotham ends up with the post conviction petition, which his own judicial bias is the core issue in the post conviction petition. He controls the funding in the post conviction. One investigator who's looking at the bailiff and trying to find the bailiff, her hours are so badly cut by either Judge Hotham or the Office of Contract Counsel in Phoenix, which Judge Hotham had input in how much he should, the office should fund these investigators in post conviction. One investigator quits. There's delay. A new investor comes on board. She submits hours. Her hours are cut. David Lee Partito is the state PCR attorney. His hours are cut inexplicably. And at some point he files a motion to be paid with Judge Hotham because he's gone 10 months without payment. Judge Hotham was in a position to control the post conviction proceeding. Can I interrupt for just a minute? The state argues that this PCR bias is not cognizable here. How do you respond? Absolutely. That's true. That's not a cognizable claim in habeas corpus. But what it goes to, Your Honor, is Judge Hotham's mental state. That's what we're talking about here. His mental state when? In terms of at that point accepting the post conviction case after having been ordered recused by the presiding judge in the superior court. But if what happens in the PCR stage is not cognizable here, you're telling me then that I look at this as I'm trying to figure out what his mental state was when he was presiding over the guilt phase? Yes. Is that what you're saying? That's what I'm saying. I think it's all of a piece. I think that the failure of Judge Hotham to comply with the code of judicial conduct, and it's the same code that Your Honors have under a federal statute, you have a duty to recuse or you may be some ground upon which somebody may want to move to recuse you. At what point during the trial did the parties become aware of the relationship between the bailiff and the widow and the victim? During jury selection. Yes. So very early on. Very early on. They know this very early on, right? Yes, Your Honor. And it happened twice as we've briefed and as the record reflects. So it's not as though the parties as they went through trial were unaware of the problem? I don't think they were aware of the depth of it until Judge Hotham actually convened the hearing where his bailiff testified to his relationship to the victim. They knew each other for 20 years. One was a county sheriff's deputy, one was a DPS officer. And at what point in the trial proceedings did that hearing take place where the bailiff testifies? That hearing took place after lead counsel saw the bailiff hug the victim's widow during jury selection out in the hallway. But this is happening pre-trial, correct? Yes, sir. Okay. Counsel, since you're almost out of time, I'd like to ask you this.  Counsel, what's your best argument that your client is entitled to a reversal of the sentence here? Which one should we focus on? You've got a lot of them out there. Which is the best one? It's the judicial bias claim. And I think it stands on its own. I think the relationship between the bailiff and the victim and the victim's widow is sufficient in our claim two on the ineffective assistance claim. But I think that consistent with Bracey v. Gramley in the United States Supreme Court, what happens if the judge does something more to implicate himself in some kind of conflict situation? And if the judicial bias is your strongest claim, what about the point that Judge Fletcher mentioned that this may not be cognizable at this stage in this proceeding? What do we do with that? Well, that's not the – Judge Fletcher's point was whatever happened in the State Post conviction is not – it's not cognizable as a claim. The facts of what happened at that stage are what is supportive of the judicial bias claim and the ineffective assistance claim are cognizable. He said they're interlinked factually, but not in terms of a legal statement. Correct. And it would be the equivalent of the case like – and I'm not sure we briefed it, but the DelVecchio case that this Court has considered on Nevada's adherence to procedural default rules. You can go back and – Do you want to save your remaining time? Yeah, I'll save – I'll speak for 15 more seconds, Your Honor, and I'll sit down. But in DelVecchio, the – my colleagues in the Capital Habeas Unit in Las Vegas culled all the records of the Nevada State Court post-conviction proceedings, direct appeals and such, and they presented to the district court evidence to show – and it was evidence. Even though these were court opinions and rulings by judges, they demonstrated the lack of uniformity of compliance with State procedural default rules. And so those claims would not have been cognizable as claims in front of the district court or this Court, but it was evidence of what the practice was in the State. I do have to ask you this. If it had been the judge personally who knew the deceased officer, it's really, really clear. But this is the judge's bailiff. Now, maybe they were really close. I don't know. But isn't that once removed? In what way do we evaluate that? Judge, respectfully, Judge Reinstein, who at that time was the presiding judge who took Judge Hotham off the case, he said this is the equivalent. This is Judge Hotham's court family. They work together. He said there's only four employees that work for the judge. They're very close. Bailiff Mills has been with the judge for five years. He said this is the judge's court family. So that's the nexus. If somebody's working for the judge, they're part of the family, and any relationship they might have could potentially be disqualifying. Is that correct? I think at least under the sort of unique facts of this case, where the judge was going to sit in judgment at a death penalty hearing, and he was going to have to explain to his bailiff why he did or didn't kill the 19-year-old defendant who killed the police officer. That's what he was going to have to look him in the eye and talk about. And I think getting Judge Fletcher's decision and at Traveria and what I think Judge Due did in the district court there said we look at these relationships. It's the circumstances and relationships that have to be considered, and I just don't see how there's any way to get around the fact of this relationship that Judge Hotham had with his bailiff and the bailiff's 25-year relationship with the victim's widow and 20 years with the victim. I don't know how we turn a blind eye to that. I understand your point, but when you do look at judicial disqualification, even in our cases, we can have people within our small court family who are recused from the actual consideration of a case, even though they're sitting right there down the hall. So it's hard to – I guess your view is that somehow the bailiff here takes on a special mantle with the judge. He's law enforcement. The victim is law enforcement. There's a police presence in the courtroom. And Detective Douglas Beatty, the case agent, also a county sheriff's deputy, he was interviewed by the pre-sentence report writer, the probation officer. He said, I think this guy should get the death penalty. Nobody objects to it. It was highly – it wasn't even a victim impact statement because the case agent is not a victim's family member. And 18 – Thank you. I'm sorry. Thank you, Your Honor. If you want any rebuttal time, which you've now cut into, like you're in the minus phase. But I appreciate your argument. Good morning, Your Honors. Julie Doan, representing Respondent Charles Ryan in this case. I guess I'll go to the McKinney issue since that seemed to be what the court was interested in first with Mr. Gabrielson. I'll just try to go down the questions that the court had and see if I can answer them that the court had of Mr. Gabrielson. Judge McKeon, you asked about the weight of the aggravation of the murder of a police officer. In this case, I think the sentencing court – and let me find my notes on that. There was a lot of information in this case. Here it is. The sentencing court, when found at sentencing, that the F-10 aggravating circumstance, which is the murder of an on-duty police officer, carries significant weight. The unprovoked murder of a police officer, so the defendant can avoid his obligation under the law, is really no less than a personal declaration of war against civilized society. And then he summed up, based on the F-2 aggravating factors of the prior serious offenses and the murder of the police officer, that in some aggravating circumstances are strong, the mitigating circumstances are not. I think that is a good answer to your question of how the murder of a police officer is viewed. I looked for law in Arizona to find out, you know, because I know in other cases they've talked about another aggravating circumstance, like multiple murders, the F-8 aggravating factor. That is a strong aggravator. I couldn't find any language, really. It's just always the murder of a police officer, you know, is an aggravating factor. But I thought the sentencing court in this case summed up pretty well how they looked at that aggravator. And what's the State's best argument that Mr. Martinez was not prejudiced, assuming for a moment that the Arizona nexus rule was unconstitutional? Okay, assuming it was unconstitutional under Brecht, and maybe I can also try and answer Judge Fletcher's question as far as how this court would look at prejudice under Eddings. You asked whether or not you would have to predict what a judge would do. Or the sentencing court, so Arizona Supreme Court, which was the ultimate sentencer and doesn't de novo, for sure. Exactly. I think you would maybe have to, to an extent, predict what the court would do, only because you would be looking at the Brecht standard, which is, you know, can we say with fair assurance that his total evidence in non-statutory and statutory mitigation was not sufficient to overcome the aggravating factors and call for leniency? And to the extent you'd have to predict is you would have to look at that under Arizona law. So I know that's not a great answer to your question, but... Well, I mean, that's the problem with harmless error always, that you're trying to predict what would have happened in a hypothetical world, for sure. Yeah, so you'd have to place yourself in the position of the judges just to the extent of applying Arizona law, but obviously you can't put yourself in their minds. Put yourself in the position of the sentencing judge, right? I'm sorry? We place ourself in the position of the sentencing judge? Well, in this case, when you're looking at Brecht, I think you can look at both. Stokely and Murray both talked about that, Stokely v. Ryan and then Murray v. Shryo. And the language they had there is when you're looking at Brecht prejudice, Murray cites Stokely and says, where the appellate court reviews all the mitigating and aggravating factors individually and confirms the trial court's determination that there were no grounds substantial enough to warrant leniency, the appellate court's Eddings error with respect to a relatively minor mitigating factor does not create a reasonable likelihood that but for the failure to fully consider that factor, the state courts would have come to a different conclusion. So they say you can look at both courts and look at whether the courts did things consistently. And that is what we argued here in our briefs is looking at the sentencing court. It's clear from the sentencing court's language that they considered all the mitigating circumstances under Eddings. On ER 1720, I believe it is, the court comes to the conclusion and said the court finds family history to be a mitigating circumstance, but then goes on and says as to the weight to be given this mitigating circumstance, substantial weight is given upon a showing that it significantly affected or impacted the defendant's ability to perceive, to comprehend, or to control his actions. So I think right there it's clear that the sentencing court, in this case Judge Skelly, did not violate Eddings. It says they found his family history to be a mitigating circumstance, but then went on to look at the weight that it was to give it. The problem is that the Arizona Supreme Court is the second actor, and it does the sentencing de novo. And the Arizona Supreme Court, at least I read it with respect to family history, says there's no causal nexus and we give it no weight. That strikes me as an Eddings violation. So I get not to error. I conclude there's error. I get to prejudice. You get to prejudice, exactly. Well, that's why my prejudice question was going back to can we look at how the sentencing court looked at it. In effect, in our structure, the sentencing court is somewhat wiped out. I'm sorry? In our structure, the sentencing court is essentially wiped out by the Arizona Supreme Court ruling. But then my question was, well, on the prejudice, can we even look really to see how a judge looked at this when that judge considered the information? I think you can under Murray and Stokely. The language under Murray and Stokely both say that you can look at the sentencing court and the Arizona Supreme Court and see if they consistently would have come to the same conclusion that the mitigation was not sufficient to, and I'm getting all my words mixed up, sufficiently substantial to warrant leniency. I'm not sure I want to put words in your mouth, but I think your argument is, as we're trying to predict what a sentencing court would have done, a sentencing court in the abstract, we don't know what the Arizona Supreme Court would have done had it not committed the Eddings error because it did commit the Eddings error. We do, however, know what the trial court did without the Eddings error because it didn't commit the error. But that's just one judge. That's your argument, which I think is worth something. But the limitation on the argument is that's just one judge. That is just one judge. And to that, kind of tangentially, your colleague on the other side has argued about an implied judicial bias, but that judge is kind of out of the picture now, right? If we're reviewing this de novo, does it matter what he did as long as we review the facts and make our own determination de novo? Well, and the issue there, too, is his implied judicial bias claim goes to Judge Hotham. Judge Skelly was the sentencing judge here, which is the judge we're asking you to look at, his language, and look at whether he and the Arizona Supreme Court would have consistently found that the mitigation was not sufficient to warrant leniency. I hope I'm making it clear. But if we find implicit bias, and we're encouraged to do so by your adversary looking at the entire behavior of this judge, if we find implicit bias, we then — there's no sort of prejudice analysis. We just set it aside. If you find there's actual bias, yes, or, yeah, prejudicial bias, yeah, we agree that's true, sure. Whether we find it as explicit or implicit, if we find actual bias, we just set it to one side. There it is. Whether or not there's anything that happened during the guilt phase of the trial that gives us reason to think that the judge behaved improperly. We don't even look at that. I'm sorry. You wouldn't look at — That is to say, once we find bias, we don't need to find anything else. We do not need to find evidence of improper behavior. Well, and in — yeah, I guess because of the unusual circumstance of this case, if you do find bias in the guilt phase, which is like, you know, my — Mr. Gabrielson recognized you can't look at whether there was bias in the PCR proceedings. It's not cognizable. But if you find bias in the guilt phase and the guilt phase falls away, then obviously you can't look at the sentencing. Exactly. You don't get to the sentencing, which is a different judge. And my point is we don't look at — there's no prejudice analysis once we've found bias. Once you find bias, no. Yeah, exactly. So it doesn't matter that the real worry about this judge apparently was that he would sentence differently because of the relationship rather than because of the way he would conduct the trial. But once we find bias, that falls away. We don't — we just set it to one side. Yes, if you find bias based on what he did in the guilt phase. So, yes. And we would argue that there is no bias. There's no implied bias. I mean, his suggestion of bias is all based on, you know, a suggestion of some invidious motive by the judge that he's going to try and do things to please his bailiff. And we just think that's too far-fetched. You can't — that does not overcome the presumption of judicial integrity. Is there any case or other cases that are comparable in connection with this implied bias? For example, where a bailiff had something similar and the judge was deemed to have an implied bias because the bailiff was part of the, in quotes, court family, in quotes. Have you ever heard of such a case? No. I looked and I could not find any kind of case. The closest case we found was the Jorgensen v. Cassidy case that we cited in our brief, where they tried to argue that Judge Munson was biased or his — that he refused to recuse himself because the defendant before him, Jorgensen, or the party before him, had clerked for him eight years prior. And Jorgensen had said that he was going to use his influence with the judge to guarantee, you know, positive outfluence in his case. And the court said that the statements by Jorgensen and his conduct only spoke to his — what he was doing, Jorgensen's, and not Judge Munson's possible bias. And that's the same that we would say here. You know, if the bailiff had a relationship with the victim, that speaks to the bailiff. You can't impute that to the judge just because they work together. Well, you can and you can't. If I'm trying to put myself in the position, I've got a bailiff who's worked for me for a number of years, I think five or six. He's got a very long-term relationship with the victim and with the surviving widow. I'm now looking at my own behavior. As it comes to sentencing, I'm really uncomfortable with trying to decide how to sentence somebody in that circumstance. And I think that's why Judge Reinstein, the presiding judge, said in this case, you know what? Just to be careful here, a cautionary measure, let's put another judge on as the censored. So because the guilt phase was obviously done by a jury. Right. Mm-hmm. So then he took Judge Hotham out of that position. How do you then benchmark the bias in the guilt phase, in your view? I mean, under what lens do you look at the bias or the appearance of impropriety? I have a hard time answering that question because I don't think there is any appearance of bias. I don't think you can retroactively say, because he moved for recusal after the case was over, that he was biased in the guilt phase. Especially when there was a hearing beforehand with the bailiff and he testified, and defense counsel only ever sought for reassignment of the bailiff. He never asked for the judge to recuse himself. There was no indication that he was imputing the bailiff's relationship to the judge and suggesting that there was a potential of implied bias. The only interest this judge had in this case was to make sure that Ernesto Martinez got a fair trial and they wouldn't have to redo it, which I think is evidenced by the fact that he asked the bailiff to wait outside the courtroom when the medical examiner testified, just to make sure there was nothing that could be said later about the bailiff's reaction to the medical examiner's testimony. I think it's a prophylactic method, and it shows that he wasn't biased, and he was trying to do everything he could to make sure this defendant got a fair trial. Or to do everything he could to avoid being reversed. Those are different questions. You don't think they're one and the same? In an ideal world. Yes, exactly. Because there is a presumption of judicial integrity. I'm trying to think if there's other questions here that I did not answer that you guys had asked of my colleague. I know it's probably a losing argument, but we still would argue that there was no McKinney error. I don't know if you want me to even try and argue that here. Well, seeing only for myself, I can read. And what I read in the Arizona Supreme Court decision with respect to family, the court says, no causal nexus, no weight. To me, that's McKinney error or Eddings error. Well, let me just tell you the couple issues that we have with that, with all due respect, based on the McKinney decision by your honor. And I'm here not relying on McKinney. I'm relying on reading what the Arizona Supreme Court said in this case. Okay. Based on Eddings. Based on Eddings. That's right. I shouldn't call it McKinney error. I'll call it Eddings error. Okay. All right. Well, to distinguish it from McKinney, where you found, you cited to the Martinez case, in a lot of the cases that have found McKinney or Eddings error that came out after McKinney, they talked about how those cases cited Roth, Wallace, or some other case where there had been found an unconstitutional causal nexus violation. None of those cases were cited in this case. I understand. And then the other thing we would point to is in the Arizona Supreme Court's decision, because the McKinney case talks about how the court consistently applied the Eddings causal nexus violation over the 15-year period. But in the McKinney opinion itself, there was a couple of non-statutory mitigating factors. In the personality disorder, they made it clear that we considered it, but found that it didn't warrant substantial weight. So even in the opinion itself, if you're saying it consistently applied Eddings error, it didn't consistently apply in this opinion itself. Do you see what I'm saying? I see what you're saying, but I guess I read it a little differently.  And I know in these long opinions, you get different phrasings sometimes of how the court, but this one seemed, in relation to some of the others, we've seen reasonably categorical about how it should view the evidence. Based on the language. Just based on the language, but I hear your point. And then the other argument we'd make under the Brecht harmless error argument is we think this case is different than other cases where they have not found that it was harmless. For example, in McKinney itself, as this court said, that his childhood, his prolonged childhood abuse was beyond the comprehension of understanding of most people. We would argue that Martinez's regrettable childhood was not beyond the comprehension. Although most kids don't sleep with a hammer in their bed. Yes, but you also have to look at the fact that in McKinney, it continued on and on and on. No, no, I'm well aware of the distinction. Yes. No, no, the experience in McKinney was worse. I get that. Yeah, and I would argue the same goes for Poisson, that the mitigation that was presented there was a lot worse. And in Poisson, also another distinguishing factor is Poisson expressed remorse. In this case, Martinez laughed later about blasting away a police officer. That is not remorse. And as far as his childhood goes, when he was 10 or 11 is when his family made this change. His father, you know, went to a retreat, became religious. They moved to Payson. They started taking the kids to church. And this was all brought out in the sentencing hearing before Judge Skelly. The sister, as my colleague has said, you know, went on to join the Air Force. And at the sentencing hearing, she was talking about how she would be operating drones overseas. She experienced all the same background. Survival of the fittest. Yeah, but even when they were young, they had different reactions to it. Martinez, this is just how he reacted to this. That actually, in a way, highlights the problem, doesn't it? I mean, she survived it, but it's like the eggshell plaintiff or something. This young boy did not do well. But if you look at the McDonald evaluation that was submitted at sentencing when he was 15 years old and some of the stuff that was brought out during that evaluation, you know, and he's like, because I want to. And he said, pardon the expression, he said, my dad's a dick. But at that point, he was 15. His family had moved to Payson and had been there for three or four years already and had been taking the kids to church. He was rebelling against his family. So, I mean, there's some accountability there beyond his regrettable childhood. And I think I've answered all your questions, but if I haven't, is there any other questions this Court has? Thank you. Thank you. You may have a minute of rebuttal, Mr. Gabrielson, if you can contain yourself. I'll give you a minute and three seconds if you can contain yourself. No, no. It's a pleasure to come here and have the Court be so engaged, really. I appreciate that. The question of did Judge Hotham only develop a bias when it was getting close to the sentencing hearing, I don't think we can put that final point on. I think the bias started from the minute that he got assigned the case. The case had heavy press coverage. Everybody in the Maricopa County Courthouse knew exactly what was going on in this case. And I have to go back to something that we haven't talked about much today, and that is, again, the Code of Judicial Conduct. He had an obligation to tell Ernesto Martinez, his lawyer, you know, I have this connection to this bail. If it shouldn't take two serendipitous encounters in the hallway where lead counsel just happens to be present. I mean, if lead counsel is not in the hallway when these things happen or isn't in the courtroom when there's a break in the jury selection and actually see what's happening between the bailiff and the victim's widow, we're not standing here today. We're talking about causal nexus and maybe something else, but this isn't even an issue, right? You're a really good lawyer, but I do want to ask you one question here. I ask your opponent here. Do you have a case, federal or state, where a judge is deemed to have an implied bias based upon the fact that a member of his or her court family, in quotes, knew the victim of a death? I have not found that. Similar to Ms. Stone, I haven't found that case, Your Honor. It isn't a case, is there? Well, I mean, I think this is such a unique circumstance. I mean, what judge would really stay on this case knowing what his bailiff's proclivities are, the bailiff's relationship to the victim and the victim's widow? And to have this overwhelming police presence in the courtroom, what judge would think it's appropriate to sit on that case? I'm suggesting that these cases don't occur because it would be wrong to do that. It would be wrong to do that. This judge was going to sit in judgment at capital sentencing. Thank you, Your Honor. Thank you. I would like to thank both counsel. I think the arguments were very helpful today, and also the extensive briefing. We appreciate that, as well as your 28-J letters. With that, we're adjourned. The case of Martinez v. Ryan is submitted.
judges: McKeown, W. Fletcher, M. Smith